UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ARUBA HOTEL ENTERPRISES N.V. | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| v. | : | 3:07-cv-1297 (JCH) |
| | : | |
| MICHAEL BELFONTI, | : | |
| MCR PROPERTY MANAGEMENT INC., | : | |
| | : | |
| Defendants. | : | |
| | : | JANUARY 23, 2009 |

**RULING RE: PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT(DOC. NO. 84)
AND DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT DENYING
AHE'S REQUEST FOR A PERMANENT INJUNCTION (DOC. NO. 93).**

**I.    INTRODUCTION**

Plaintiff Aruba Hotel Enterprises N.V. ("AHE") brings this action seeking a

declaratory judgment pursuant to the Declaratory Judgment Act ("DJA"), 28 U.S.C. §

2201(a), stating that monies claimed by defendants Michael Belfonti and MCR Property

Management Inc. ("MCR")(collectively "defendants") to be loans were actually capital

investments in AHE, not loans, and cannot be enforced as loans.  AHE also seeks a

permanent injunction prohibiting defendants from attempting to enforce the claimed

loans, as loans, under the theory of unjust enrichment or otherwise in any other

jurisdiction, specifically, Aruba.

AHE now moves for Summary Judgment on all of its claims (Doc. No. 84).

Defendants oppose the Motion for Summary Judgment and make a Cross-Motion for

Summary Judgment on AHE's request for a permanent injunction (Doc. No. 93).  For

the following reasons, the court GRANTS plaintiff's Motion for Summary Judgment and

GRANTS defendants' Cross-Motion for Summary Judgment.

**II.     FACTS**[1]

 **A. Purchase of AHE**

 AHE is an Aruban entity in which defendant, Michael Belfonti, had a seventy-five percent ownership interest.  The other twenty-five percent was owned by the Hochefelder family.  In May 2006, AHE purchased what is now known as the Westin Aruba Resort (the "Hotel").[2]  To finance the purchase of the Hotel, Belfonti arranged for two loans.

  **1. Mortgage Loan**

 The first loan (the "Mortgage Loan") was made to AHE by WIBC Aruba N.V. ("WIBC"), which is an affiliate of Wachovia Bank, National Association ("Wachovia") in the amount of $230,000,000.00.  The terms of the Mortgage Loan were memorialized in a loan agreement between AHE and WIBC, dated May 3, 2006.  Belfonti signed the Mortgage Loan on behalf of AHE.

  **2. Mezzanine Loan**

 The second loan (the "Mezzanine Loan") was made by Petra Mortgage Capital Corp., LLC ("Petra Mortgage") to BCP Florin, LLC ( "BCP Florin") in the amount of $19,450,000.00.  Belfonti was a 75% beneficial owner of BCP Florin.  The terms of the

---

[1]  For the purposes of the Plaintiff's Motion for Summary Judgment, the court accepts facts undisputed by the parties as true and resolves disputed facts in favor of the defendants, where there is evidence to support his allegations.  With respect to Defendants' Cross Motion for Summary Judgment on AHE's Request for a Permanent Injunction, the court will consider the undisputed facts as true and resolve the disputed facts in favor of AHE and determine whether, as a matter of law, an injunction is warranted.

[2]  At the time of the purchase it was known as the Wyndham.  Beflfonti Dep. Tr. at 14.

Mezzanine Loan were memorialized in a loan and security agreement executed on or about June 9, 2006.  The Mezzanine loan was secured by a security interest in one hundred percent of the issued and outstanding equity in Twilight Holdings, LLC ("Twilight").  Twilight is a Delaware LLC that was an indirect subsidiary of BCP Florin and, at the time, majority-beneficially-owned by Belfonti.

B.    MCR Transactions

MCR is a property management company.  In 2006 MCR was owned by Belfonti's mother and father.  Since 2006, Belfonti has served as the chief executive of MCR, and it is currently owned by Belfonti and either his mother or his mother's trust.

MCR alleges that it made a loan to AHE in the amount of $1,307,611 ("$1.3 Million MCR Transaction") on January 8, 2007.[3]  The money was paid from the bank account of Belfonti's attorneys in Connecticut to Wachovia in North Carolina.  It was made in order to satisfy AHE's monthly mortgage payment obligation under the Mortgage Loan.  Had he not made this payment, Belfonti would have lost his ownership in AHE.  Belfonti Dep. at 120-1.  Belfonti, on behalf of AHE, agreed to accept the $1.3 Million MCR Transaction.  Id. at 122.  There was no negotiation concerning the terms of the $1.3 Million MCR Transaction.  Id.  Nor was there a payment schedule for the repayment of the alleged loan.  Id.  AHE did not have an obligation to pay interest on

_____

[3] This loan was aggregated with a separate loan to AHE made by Belfonti Capital Partners in the amount of $548,250.  The combined amount $1,855,861.80 was paid directly to Wachovia.

3

the $1.3 Million MCR Transaction.  Id. at 122-3.[4]  AHE did not attempt to obtain this money from any other source because, according to Belfonti, no lender would agree to make this loan without security.  Id. at 124.  There is no written agreement memorializing this alleged loan.  Id.  Neither MCR nor AHE was represented by counsel when making this transaction.  Id. at 126.

MCR also alleges that it made a loan to AHE in the amount of $1,161,874 ("$1.2 Million MCR Transaction") on or about March 9, 2007.  This sum was paid directly from MCR's Connecticut bank account at People's Bank to Wachovia in North Carolina to satisfy AHE's monthly payment obligation under the Mortgage Loan.  Like the $1.3 million MCR Transaction, there are no documents memorializing this transaction.  Id. at 163.  Similarly, this alleged loan had no maturity or due date nor did AHE provide any security to MCR for the transaction.  Id. at 161.  Moreover, AHE, acting through Belfonti, did not attempt to secure the money from any other source.  Id.

With respect to both of these transactions, it was Belfonti who decided to make the alleged loans on behalf of MCR, and who also decided to accept the loans on behalf of AHE.  Id. at 165.  Furthermore, they were not submitted to AHE's supervisory board for approval. Id. at 164.  Belfonti testified that the alleged loans were either not subordinated to AHE's preexisting loan obligations or that he did not know whether they

---

[4] Belfonti testified to various or no interest rates that may have applied to the alleged loan.  At first he stated that no interest applied.  Belfonti Dep. at 122-3.  He then testified that the interest would be paid at the rate of 12% because that was the rate he typically applies to loans made between his various entities.  Id. at 132-3.  He later testified that, because of the international nature of the transaction, an 8-9% interest rate applied to the alleged loan.  Id. at 160-1.  It is clear, and agreed upon by the parties, that interest was not something Belfonti considered when he approved each loan.  Id. at 161; see also Def.'s Response to 56(a)(1) Stat. at ¶ 14.

were subordinated, and he would need to consult with his attorneys for an answer. Id. at 123, 164, 166. Belfonti also testified that it was AHE's priority to pay the Mortgage Loan and the Mezzanine Loan first. Id. at 140.

      C.    Defaulted Loans

      In April 2007, AHE defaulted on the Mortgage Loan and BCP Florin defaulted on the Mezzanine Loan. Petra then voluntarily cured the default on the Mortgage Loan, foreclosed on its security interest in Twilight under the Mezzanine Loan and, as a result, became the subsequent owner of AHE.

      On August 21, 2007, AHE (through its new owners) received a letter from Attorney Johan P. Sjiem Fat of Sjiem Fat & Kuster in Aruba. This letter was sent on behalf of defendant MCR, a corporation, as well as other nonparties,[5] claiming that these entities made loans to AHE during the time that Belfonti was controlling principal of AHE. The letter demanded payment of the loans by August 24, 2007, at noon. The letter was the first time that any demand was made on AHE by any of these entities for repayment of the purported loans. On August 23, 2007, AHE responded that it would "forcefully defend any proceedings that may be brought" against them by the defendants. Navarro Aff., Exh. R. Defendants understood this as a refusal to pay. Def.'s Mem. in Opp. at 9.

      D.    Pending Lawsuits/Procedural Posture

      Upon receiving AHE's response, defendants filed a complaint in Aruba seeking

---

[5] These nonparties include: Belfonti Holdings, LLC, Belfonti Capital Partners, LLC, and CEB Irrevocable Trust.

repayment of the loans.  Mervis Aff., Exh. G.  In response, AHE filed actions in this court as well as in the Southern District of New York seeking a determination by the courts that each of the alleged loans could not be enforced.

## III.    STANDARD OF REVIEW

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); White v. ABCO Engineering Corp., 221 F.3d 293, 300 (2d Cir. 2000).  Once the moving party has met its burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 255, and present such evidence as would allow a jury to find in his favor in order to defeat the motion. Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

Generally, when assessing the record, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought.  Anderson, 477 U.S. at 255; Graham, 230 F.3d at 38.  "This remedy that precludes a trial is properly granted only when no rational finder of fact could find in favor of the non-moving party."  Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000).  "When reasonable persons, applying the proper legal standards, could differ in their responses to the question" raised on the basis of the evidence presented, the question must be left to the jury.  Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000).  "When faced with cross-motions for summary judgment, a district court is not required to grant judgment as a matter of law for one side or the other."

6

Heublein, Inc. v. United States, 996 F.2d 1455, 1461 (2d Cir. 1993).  "Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." Id.

## IV.  DISCUSSION

### A.    Choice of Law

"A federal court sitting in diversity applies the choice of law rules of the forum state," in this case, Connecticut.  Maryland Casualty Co. v Continental Casualty Co., 332 F.3d 145, 151 (2d Cir. 2003)(internal citation omitted).  Connecticut courts, at least for contract claims, have adopted the "modern" choice of law rules found in the Restatement (Second) of Conflict of Laws (1971) ("Restatement"), which directs courts to adopt the "most significant relationship" approach when analyzing choice of law issues.  See, e.g., Am. States Ins. Co. v. Allstate Ins. Co., 282 Conn. 454, 461 (2007). "Where there is no choice of law provision in the contract," which is the case here as there is no written contract, "the general rule to be applied is that of § 188."  Id.  Section 188 provides in relevant part, "[t]he rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6."  See id. n.6 (citing Interface Flooring Sys, Inc. v. Aetna Casualty & Surety Co., 261 Conn. 601, 608-9 (2002).

Section 6 sets forth seven "overarching considerations in determining which state has the "most significant relationship" to the dispute:

> (a) the needs of interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied.

Allstate, 282 Conn. at 467-8.  Furthermore, 188(2) lists five contacts to be considered in applying the principles set forth in § 6 to a contract dispute:

> (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties.

Id. at 468.  The parties have not created a record that allows this court to fully analyze these factors.  However, the court need not analyze whether, under Connecticut choice of law rules, Connecticut or Aruban law applies.  Both parties agree that, under Connecticut choice of law rules, Connecticut substantive law applies.[6]  Therefore, this court will apply Connecticut law.

B.      Breach of Contract

Plaintiff requests a declaratory judgment stating that the MCR transactions cannot be enforced as loans.  Both parties assert that there was an agreement (i.e. MCR agreed to give AHE money and AHE accepted the money).  The discord centers around whether that agreement was in the form of a loan or a capital contribution.

---

[6] While the court does not understand the basis for this reservation, the defendants state that they "reserve" the right to present alternative arguments to the courts of Aruba that Aruban substantive law should apply and under that law, the transactions at issue are enforceable loans.  See Def.'s Mem in Opp. at 19 n.18.

8

Plaintiff argues that the MCR transactions are not loans as deemed by the defendants, but instead were intended to be capital contributions to AHE, and contends that this can be determined as a matter of law.  Defendants dispute this and ultimately argue that this issue is not appropriate for summary judgment because there are disputed issues of material fact as to the question of whether the transactions were meant to be debt or equity.

In Connecticut, an agreement is not enforceable as a contract unless its terms are definite and certain.  Suffield Dev. Assocs. Ltd. P'ship v. Soc'y for Sav., 243 Conn. 832, 843, 708 A.2d 1361 (Conn. 1998).  "Although ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact . . .where there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law."  Conn. Light & Power Co. v. Lighthouse Landings, Inc., 279 Conn. 90, 109, 900 A.2d 1242 (Conn. 2006)(internal citations and quotations omitted).  While all the terms of a contract do not need to be present, all the essential terms must have been agreed on.  Glazer v. Dress Barn, Inc., 274 Conn. 33, 873 A.2d 929, 943 (Conn. 2005).  If there are no terms, as is the case here, the intent of the parties is paramount.  As articulated by the Supreme Court of Connecticut,

> [a] contract must be construed to effectuate the intent of the parties, which is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. . . . The intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . . [w]here the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms. . . . any ambiguity in a contract must emanate from the language used in the contract

rather than from one party's subjective perception of the terms.

Lawson v. Whitey's Frame Shop, 241 Conn. 678, 686, 697 A.2d 1137 (Conn. 1997)(internal quotation marks omitted).  Additionally, whether the parties intended to be bound without signing a formal agreement is "an inference of fact for the trial court . . ." Suffield 243 Conn. at 847( Berdon, J., dissenting)(quoting Steeltech Bldg. Prods., Inc. v. Edward Sutt Assocs., Inc. 18 Conn.App. 469, 471-2, 559 A.2d 228 (1989)). Because determination of the terms of the MCR transactions requires an inquiry into the parties' "subjective perception of the terms" and an "inference of fact," this is an issue that must be determined by the jury.

　　　　In support of its Motion, AHE claims there is no disputed issue of material fact as to the intent behind the MCR transactions because there is no evidence that they were intended to be loans.  In support of this argument, AHE points to the fact that the alleged loans have no actual terms nor have they been reduced to writing.  It further argues that Belfonti made a practice of "shuffling funds back and forth amongst his assorted entities," which means such transactions can only be "characterized as investments of risk capital."  Pl.'s Mem. in Supp. at 12.  To support this claim, plaintiff cites Belfonti's testimony that he did not expect AHE to repay the alleged loans until AHE was able to meet its operational needs and its obligations with respect to the Mortgage Loan from cash generated from the operations of the hotel or from a capital event, such as a refinance or a sale.  Belfonti Dep. at 123-4, 162.  This, according to AHE, is not consistent with a standard loan and thus cannot be characterized as such. Accordingly, AHE requests the court to find, as a matter of law, that the MCR

transactions were intended to be capital contributions.  The court declines to do that on this summary judgment record.

Defendants point to the deposition testimony of Marieta Ras, AHE's Managing Director, to support the claim that, "at the time the loan was made, an entry in the exact amount of $1,307,611.80 was entered at the direction of Ms. Ras on AHE's financial records as a long-term liability."  Def.'s Mem. in Opp. at 14; Ras Depo. at 237.  This amount is indeed reflected on the ledger.  See Navarro Aff. Exh. E.  Moreover, defendants contend that Ras has changed her story after Petra took ownership of AHE and now says she intended for the entries just be "placeholder" entries.  See generally Ras Dep.[7]  Determination of Ras' intent requires a determination of her credibility, which is a function left for the jury.

The only evidence that the transactions were logged as loans rather than capital is testimony from Belfonti in which he states that the transactions were always intended as loans and it was his "intent to always pay them back."  Belfonti Dep. at 157. Accordingly, because there is no written instrument in this case, whether Belfonti intended the transactions as loans or equity depends on a determination of Belfonti's credibility, which determination is a function for a jury.  Determination of these credibility issues is a jury function, and thus a grant of summary judgment, on these grounds, is inappropriate.

_____

[7] Neither party provided the court with a full transcript of the Ras deposition.  This "placeholder" language comes from the defendants' filings.  Def.'s Res. to Pl.'s 56(a)(1) Stat. at 11.  The portions of the transcript that were provided to the court allude to the fact that Ras directed the MCR transactions to be booked as long term liabilities in AHE financial records but later understood them to be capital contributions.

C.      The Alleged Loans Cannot be Enforced As Such.

Plaintiff argues that, even if the court considers the MCR transactions as loans, they would be unenforceable as a matter of law.  Plaintiff presents three arguments to support this claim.  First, it argues that the agreements are barred by Connecticut's Statute of Frauds.  Second, it states that the alleged loans are unenforceable for lack of definiteness.  Finally, AHE claims that it is under no obligation to repay the alleged loans under the equitable theory of unjust enrichment.

1.      Statute of Frauds

AHE argues that the transactions are barred by the Statute of Frauds.  Indeed, the Statute of Frauds bars the enforcement of an agreement which exceeds fifty thousand dollars, as is the case here, if the agreement has not been reduced to writing and signed by the party to be charged.  The Connecticut Statute of Frauds provides, in relevant part:

> [n]o civil action may be maintained in the following cases unless the agreement, or a memorandum of the agreement, is made in writing and signed by the party, or the agent of the party, to be charged . . . (6) upon any agreement for a loan in an amount which exceeds fifty thousand dollars.

Conn. Gen. Stat. §52-550(a)(6).  Accordingly, AHE contends that, because the alleged loans exceed $50,000 and were not memorialized in writing, they cannot be enforced.

Defendants offer two arguments to defeat the Statute of Frauds.  First, they argue that the MCR transactions were reduced to writing.  Second, defendants argue that these transactions fall outside the Statute of Frauds because they were partially

12

executed.  The defendants state that the Belfonti Capital Partners' financial records

reflect the transactions as long term liabilities.  <u>See</u> Navarro Aff. Exh. E.  While the

record reflects some dispute as to whether it was Belfonti's intent to consider them

loans, the ledger on its own reflects them as long term liabilities.  This, according to the

defendants, is a sufficient writing to defeat the Statute of Frauds.  The court disagrees.

First, the Statute itself requires that the writing be signed by the party charged; there is

no signature of the plaintiff on these books.  Second, the "writing" does not reflect any

of the terms of the alleged loans. Under Connecticut law, "[w]here the memorandum

appears to be no more than a statement of some of the essential features of a

proposed contract and not a complete statement of all the essential terms, the plaintiff

has failed to prove the existence of an agreement." <u>Glazer</u>, 274 Conn. at 51 (quoting

<u>Suffield Dev. Assocs., Ltd. P'ship. v. Soc'y for Savings</u>, 243 Conn. 832, 843 708 A.2d

1361(1998))(Internal quotations omitted).  Accordingly, as a matter of law, the court

finds that the entries made on the defendants' financial records do not constitute a

writing sufficient to defeat the Statute of Frauds.

    The court now turns to the defendants' second argument, that the alleged loans

fall outside the Statute of Frauds because they were partially executed.  In other words,

because AHE received the alleged loans and used the money to pay the Mortgage

Loan, part of the loan agreement was performed.  Thus, according to the defendants,

the loan falls outside of the Statute of Frauds.

    The elements required to establish part-performance are:

    "(1) statements, acts, or omissions that lead a party to act to his detriment in

13

reliance on the contract; (2) knowledge or assent to the party's actions in reliance on the contract; and (3) acts that unmistakably point to the contract.

Glazer, 274 Conn. at 62.  Furthermore, the actions must be "of a such a character that they can be naturally and reasonably accounted for in *no other way* than by the existence of some contract in relation to the subject matter in dispute."  Id. at 67 (emphasis in original).  "Thus, acts that unmistakably point to a contract as the only reasonable explanation for their having been undertaken constitute part performance." Id. at 68.

Defendants argue that the Statute of Frauds only applies to oral promises to make a loan.  Defendants find support in Sarfaty v. PNN Enterprises, Inc., 2007 Conn.Super. LEXIS 1617 (Conn. Super. June 21, 2007), which states that "although a civil action may not be brought to enforce an *oral promise to make a loan* over $50,000, oral loans actually made over $50,000 are outside the statute and may be enforced . . ." Id. at *20 (emphasis in original).  In Sarfaty, the plaintiff, on behalf of Meriden Associates, brought an action for breach of an unwritten contract to repay a loan for $1, 155,000.  Id. at *16.  The plaintiff alleged that an individual, Yeh, transferred funds from Meriden, to PNN Enterprises, the defendant corporation.  Id. at *6-7.  The court found that, though the contract was not reduced to writing and thus, no terms or conditions for the repayment of the loans were in writing, it fell outside the Statute of Frauds because they were partially executed loans.  In arriving at this conclusion after a trial, the court first concluded that, as a matter of fact, Yeh intended the transfers to be loans.  Id. at *16.  PNN offered no evidence to the contrary.  Second, the court determined, after

14

noting that Connecticut courts must follow the "plain-meaning" rule, Conn. Gen. Stat. § 1-2z, that the Statute of Frauds does not apply to partially executed contracts.  Id. at *19-20.  Instead, according the Sarfaty court, the Statute is intended for agreements to loan, not loans that have already been made.  Id.

The court is not persuaded by defendants' arguments.  First, as discussed, supra, there are at least two reasonable explanations for the transfer of the money: loan or capital contribution.  Because there are other possible interpretations of the MCR transactions, and a loan is not "the only reasonable explanation," Glazer, 274 Conn. at 68, part-performance cannot be established.  Thus, even if the court found Sarfaty persuasive, which it does not, see infra, defendants' argument would still fail because, unlike in Sarfaty, part-performance has not been established.  In Sarfaty, the defendants offered no evidence to support a construction of the transfers as something other than a loan.  That is not the case here.

Furthermore, even if the court considered the MCR transactions as loans, it is not persuaded by the reasoning in Sarfaty that payment takes it out of the Statute of Frauds.  The Sarfaty court correctly stated that Conn. Gen. Stat. § 1-2z instructs the court to apply the plain meaning rule in construing the statutes.  However, the court does not read the Statute as narrowly as the Sarfaty court.  Plainly, the Statute of Frauds states any agreement for a loan over $50,000, that has not been reduced to writing, is unenforceable as such.[8]  Moreover, the Glazer court makes it very clear that

---

[8] The Sarfaty court appears to read the Statute to apply only to an agreements to agree, i.e., an agreement to make a loan.  2007 Conn.Super. LEXIS at *20.  This court does not believe the plain words

15

the payment of money is not evidence of part performance.  274 Conn. at 69 (citing

Eaton v. Whitaker, 18 Conn. 222, 229 (1846), for the proposition that "courts had

abandoned [the] position that payment of money was act of part performance because

of difficulty in determining what was meant by act and availability of other means of

recovering money paid."); see also Breen v. Phelps, 186 Conn. 86, 94-95

(1982)("partial or even full payment of the purchase price for the sale of land under an

oral contract does not take the case out of the statute of frauds.").  Here, the MCR

transactions, totaling over $2 million, were not reduced to any writing.  Thus, the alleged

loans cannot be enforced as loans.[9]

> 2.   Unjust Enrichment

Defendants argue that summary judgment should be denied because there is

an issue of fact as to whether AHE was unjustly enriched as a result of the MCR

transactions.  AHE, argues that, as a matter of law, it was not unjustly enriched.

"Unjust enrichment is a very broad and flexible equitable doctrine that has as its basis

the principle that it is contrary to equity and good conscience for a defendant to retain

a benefit that has come to him at the expense of the plaintiff."  Gagne v. Vaccaro, 255

Conn. 390, 409, 766 A.2d 416 (Conn. 2001).  The doctrine's three basic requirements

are that (1) the [plaintiff] was benefited, (2) the [plaintiff] unjustly failed to pay the

[defendant] for the benefits, and (3) the failure of payment was to the [defendant's]

---

of the Statute support that reading.

[9] In so holding, the court need not consider AHE's other arguments, namely lack of definiteness.

detriment." Id.  "A right of recovery under the doctrine of unjust enrichment is essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another."  Id.

The defendants' theory of unjust enrichment fails on the third factor.  It is at least undisputed that when making the MCR transactions, Belfonti did not expect AHE to repay the alleged loans made by MCR until AHE started making money and was able to meet its operational needs and its other obligations.  Belfonti Depo. at 123-4. The repayment of the alleged loans was dependant on the success of AHE.  See, e.g., Pl.'s Loc. R. 56(a)(1) Stat. at ¶ 17.  As a result, there was no true expectation of repayment because repayment was conditioned on something else: at least until that condition was met, payment was not expected.  When making the MCR transactions, Belfonti knew that there was a possibility that AHE would not succeed, and perhaps be foreclosed on, and thus, a real possibility that the defendants would never be repaid.  Because Belfonti did not expect repayment, unless AHE met its other obligations, failure of repayment is not to the defendants' detriment.  AHE did not meet its other obligations.  Thus, the defendants have not been unjustly enriched.

Moreover, in deciding a claim of unjust enrichment, the court must determine whether, under a given set of circumstances, it is "just or unjust, equitable or inequitable, conscionable or unconscionable, to apply the doctrine."  Gagne, 255 Conn. at 409 (citing Meaney v. Connecticut Hospital Assn., Inc., 250 Conn. 500, 511-512 (1999)).  Lack of repayment, under the circumstances presented here, is not

17

"unjust."  Because Belfonti did not expect repayment unless AHE succeeded, it

cannot be said that "justice requires compensation to be made," when the Belfonti-

controlled AHE did not succeed.  <u>Menard v. Gentile</u>, 7 Conn. App. 211, 216 n.4,

(1986)(finding that plaintiffs' claim of unjust enrichment would have failed

notwithstanding a finding that the defendants were benefitted because in making

improvements on the defendants' house, plaintiffs' sole intent was to benefit

themselves.).  The court finds, as a matter of law, a reasonable jury could not find that

AHE has been unjustly enriched.

     For the foregoing reasons the court GRANTS AHE's Motion for Summary

Judgment on the basis that enforcement of the alleged loans is barred by the Statute

of Frauds.

     D.    Plaintiff's Request for an Injunction

     AHE moves the court to issue a permanent injunction barring the defendants

from enforcing the transactions as loans in another forum, specifically Aruba.

Defendants move for summary judgment on AHE's request for a permanent

injunction.

     To determine whether to enjoin a foreign suit, a court must first determine

whether the parties to both suits are the same and whether the resolution of the case

before the enjoining court would be dispositive of the enjoined action."  <u>China Trade &</u>

<u>Dev. Corp. v. M.V. Choong Yong</u>, 837 F.2d 33, 36 (2d Cir. 1987).  Once these two

threshold requirements are met, the court must then consider whether one of the

following factors is present, (1) "whether the foreign action threatens the jurisdiction of

18

the enjoining forum," and (2) "whether strong public policies of the enjoining forum are

threatened by the foreign action." Id.  Additionally, courts may consider whether (a)

the foreign action would be vexatious, (b) proceedings in the other forum prejudice

other equitable considerations, or (c) adjudication of the same issues in separate

actions would result in delay, inconvenience, expense, inconsistency, or a race to

judgment.  Id. at 35.  (The China Trade court found factors (1) and (2) had "much

greater significance" than factors (a) and (c) because those factors "are likely to be

present whenever parallel actions are proceeding concurrently," and an injunction

grounded on those factors alone "would tend to undermine the policy that allows

parallel proceedings to continue and disfavors anti-suit injunctions.").

    With respect to the threshold requirements, it is undisputed that both parties

are the same in this action and the action pending in Aruba.  Defendants argue that

AHE cannot meet the second threshold requirement for an anti-suit injunction,

because resolution of this case would not be dispositive of the action in Aruba.[10]  In

the Aruban action, defendants claim that Aruban choice of law rules apply and that,

under Aruban substantive law, the transactions are enforceable loans.  Thus, if this

court grants summary judgment for AHE, it is the defendants' intention to press the

case in Aruba and to argue under Aruban choice of law, Aruban law applies, and

---

[10] Defendants also argue that AHE cannot show irreparable harm.  AHE cannot show irreparable
harm because Wachovia Bank has agreed not to foreclose on AHE.  While it is true that irreparable harm
"is required for the imposition of any injunctive relief, preliminary or permanent, the 'imminent' aspect of
the harm is not crucial to granting a permanent injunction." (internal citations omitted).  Rodriguez by
Rodriguez v. DeBuono, 175 F.3d 227, 235 n.9 (1998).  Further, the standard for a permanent injunction is
"less stringent" than that of a preliminary injunction.  Id.  The court will, thus, consider the fact that the
Aruban courts may not enforce this court's judgment as the potential "irreparable harm."

under Aruban law, defendants win.  See Mervis Rep. Aff. Exh. 9, ¶ 16 (Attorney

Kuster, admitted to practice in Aruba, stating his belief that Aruban law would govern

this action.)  In this case, the defendants agreed that Connecticut law applied under

Connecticut choice of law analysis.  It did not offer any argument or evidence that

Aruban law should apply.  If the defendants believed Aruban law applies to this

dispute, they should have argued that here.  Instead, the defendants stipulated that

Connecticut substantive law applies.  Moreover, despite defendants' contention that

Aruban law applies, it is the view of this court that a judgment from this court should

have res judicata effect on the Aruban courts because the cases involve the same

transactions and the issues are the same. Computer Assocs. Int'l v. Altai, Inc., 126

F.3d 365, 369 (2d Cir. 1997)(finding res judicata and collateral estoppel inapplicable

to foreign suit because issues in two suits were not identical and stating that "[r]es

judicata therefore bars the subsequent litigation of any claims arising from the

transaction or series of transactions which was the subject of the prior suit."); see also

Diorinou v. Mezitis, 237 F.3d 133, 140 (2d Cir. 2001)(stating that "United States courts

are not obliged to recognize judgments rendered by a foreign state, but may choose

to give res judicata effect to foreign judgments on the basis of comity.")(internal

quotations and citations omitted).  Thus, the court finds the threshold requirements

have been met.

      In reviewing the other factors, the court finds that an injunction is not

warranted.  The court begins with the issue of whether the Aruban court threatens the

jurisdiction of this court.  The Aruban court does not appear to be threatening this

court's jurisdiction, and thus, there is no need for the court to protect its jurisdiction. Counsel for AHE represented to this court that it has no basis to believe that the Aruban court would not observe <u>res judicata</u> if this court granted summary judgment in its favor. Oral Arg. Tr. at 11/3-12.

Furthermore, AHE has not demonstrated that important public policies of this forum are threatened by the Aruban action. AHE cites <u>Farrell Lines Inc v. Columbus Cello-Poly Corp</u>, 32 F. Supp. 2d 118 (S.D.N.Y. 1997), to support its claim that an injunction is necessary to "ensure the validity and integrity" of this court's judgment. Pl.'s Mem. in Supp at 22. In <u>Farrell Lines</u>, the court enjoined a foreign suit in Italy after noting that defendants conceded that they sued in the foreign forum to evade United States policy favoring the enforcement of forum selection clause and to avoid the effect of the parties' contractual choice of law. <u>Id.</u> at 130. There is no such evidence in this case. In fact, it was the defendants who first filed the parallel action in Aruba. Because AHE has not met its burden of showing that the Aruban action threatens the jurisdiction of this court nor that the defendants are trying to evade the public policy of this court, the court declines to enter an injunction as requested by AHE.

## V.    CONCLUSION

The plaintiff's Motion for Summary Judgment (Doc. No. 84) is GRANTED. Defendants' Cross-Motion for Summary Judgment (Doc. No. 93) is also GRANTED.

Accordingly, the court DECLARES that the MCR transactions are barred by the Connecticut Statute of Frauds from being enforced as loans.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 23rd day of January, 2009.


 /s/ Janet C. Hall_____
Janet C. Hall
United States District Judge